J-S48035-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| M.K. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| R.L.K., JR. | |
| APPEAL OF: M.K. | No. 477 MDA 2017 |

Appeal from the Order Entered February 15, 2017
in the Court of Common Pleas of Dauphin County
Civil Division at No.: 2016-CV-3466-CU

BEFORE: OTT, J., STABILE, J., and PLATT, J.*

MEMORANDUM BY PLATT, J.:                    **FILED OCTOBER 24, 2017**

M.K. (Mother) appeals the order of the Court of Common Pleas of Dauphin County (trial court) entered February 15, 2017, that granted primary physical custody of the parties' children, M.K. (born 12/09), E.K. (born 5/14), and A.K. (born 6/16) (Children), to Mother and supervised visitation to R.L.K. (Father). The order denies permission for Mother to relocate to Utah and grants permission to Father to relocate to Franklin County, Pennsylvania. The

_____

* Retired Senior Judge assigned to the Superior Court.

J-S48035-17

order also provides that either party may apply to modify the order after the resolution of certain criminal charges pending against Father.[1]  We affirm.

_____

[1] In final paragraph in the order complained of, paragraph 12, the trial court states:

> 12. When Father's criminal charges are resolved, either party may contact the [c]ourt to schedule a status conference.

(Trial Court Order, 2/15/17, at ¶ 12).

This sentence indicates that the trial court anticipates the possibility of further proceedings, raising the question of whether the order is final and appealable.  We find that it is.

This Court addressed the question of the finality of an order where the trial court enters an order of custody and anticipates a review of its order only upon the application of one of the parties in ***Parker v. MacDonald***, 496 A.2d 1244 (Pa. Super. 1985).  In ***Parker***, we explained:

> We agree with appellee that the current posture of this case would prevent us from entertaining this appeal if it were an interlocutory order.  However, we are unable to conclude that the Order of November 14, 1985, lacks finality. Concededly, the lower court by its own terms provided for review of its order in July, 1985, *but only upon application* for such review by either party.  This case was not scheduled for subsequent review by the lower court. Rather, the court below encouraged the amicable resolution of the custody of their son by the parties themselves.  If the parties reached an agreement, it is possible that further court intervention would not be required.  Thus, the Order of November 14, 1984, effectively ended the litigation, and constituted a final order appropriate for review.
>
> Moreover, the challenged Order disposed of the parties' rights to custody during the period between November, 1984, and July, 1985, and thereafter unless and until a petition for re-examination of custody is filed by one of the parties.  We conclude that the Order has sufficient aspects of finality to be appealable.  The motion to quash is therefore denied.

- 2 -

The trial court recites the factual details of this case in its Memorandum Opinion filed February 15, 2017, and in its Opinion Pursuant to Pa.R.A.P. 1925(a) entered April 17, 2017.  We relate the relevant procedural details of this case in our discussion below.

After holding hearings on September 6, 2017, January 6, 2017, and January 19, 2017, the trial court entered the order appealed from on February 15, 2017, accompanied by a memorandum in which it explained its reasoning underlying the order.  Mother filed her notice of appeal and concise statement of errors complained of on appeal on March 17, 2017.  *See* Pa.R.A.P. 1925(a)(2)(i).  On April 17, 2017, in response to Mother's notice of appeal, the trial court entered an opinion pursuant to Pa.R.A.P. 1925(a).  In that opinion, the trial court addresses Mother's issues raised on appeal and refers the reader to its memorandum of February 15, 2017.

_____

496 A.2d, at 1247 (emphasis in original).

This Court affirmed *Parker* in *G.B. v. M.M.B.*, 670 A.2d 714 (Pa. Super. 1996), where, referring to *Parker*, we stated:

> We concluded that the language of the trial court's order merely made explicit what is always implicit in a custody order-the availability of modification upon a proper showing by the parties-and hence that the finality of the order, which otherwise constituted a complete resolution of the parties' dispute, was not vitiated.

670 A.2d at 718 (citation omitted).

The facts in the case before us are similar to *Parker* and *G.B.* in that the order will stand as written unless one of the parties applies to the trial court for a modification; as such, it is final and appealable.

Mother presents ten questions with eight sub-issues spanning two pages for us to review. (*See* Mother's Brief, at 5-6). This is not the form of the statement of questions involved contemplated by Pa.R.A.P. 2116, but it is an improvement over the twelve pages, eleven issues, and ten sub-issues, in Mother's Rule 1925(b) statement. We quote the trial court, with approval, on the question of which issues are fairly incorporated in Mother's concise statement, and adopt the court's analysis of which issues should be addressed:

> [Mother] filed a notice of appeal on March 17, 2017—the last possible day in which the notice could be filed and considered timely. Simultaneously, [Mother] filed a Statement of Errors Complained of on Appeal (hereinafter 'Statement') pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i). However, this [c]ourt will not classify the Statement as being 'concise' as required by the rules as it consists of eleven (11) main issues, ten (10) sub-issues, and spans a total of twelve (12) pages. In addition to the overwhelming length, the Statement is riddled with opinions and characterizations by counsel that are inappropriate, irrelevant, and some completely inaccurate. As much as this [c]ourt would like to find that [Mother] has waived her issues for her failure to comply with the 'concise' requirement, it cannot in good conscience do so because once stripped of extraneous comments, opinions and extra verbiage, the issues are mostly discernable.

> After removing counsel's extraneous comments, opinions, and extra verbiage, this [c]ourt has discerned the following issues that we will address:

> 1. The [c]ourt erred by failing to address the custody factors enumerated at 23 Pa.C.S.A. § 5328(a).

> 2. The [c]ourt erred in disregarding the testimony of the agreed-upon expert, Dr. Laurie Pittman.

3. The [c]ourt erred by granting Father's request for relocation without considering any of the relocation factors enumerated at 23 Pa.C.S.A. § 5337.

4. The [c]ourt erred in awarding Paternal Grandparents visitation rights.

5. The [c]ourt erred by depriving Mother of her constitutional right to travel.

(Trial Court Opinion, 4/17/17, at 1-2) (footnote omitted).

Our scope and standard of review is as follows:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F., III v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

We have stated,

> [T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (citation omitted).

The primary concern in any custody case is the best interests of the child. "The best interests standard, decided on a case-by-case basis,

considers all factors which legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being." ***Saintz v. Rinker***, 902 A.2d 509, 512 (Pa. Super. 2006) (citation omitted).

Additionally,

[t]he parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

***S.M. v. J.M.***, 811 A.2d 621, 623 (Pa. Super. 2002) (citation omitted).

We will affirm the trial court largely on the strength of its Memorandum and Pa.R.A.P. 1925(a) Opinion entered on February 17, 2017, and April 18, 2017, respectively. We will, however rely on our own analysis of the question of whether the trial court was required, in these particulars circumstances, to address each of the sixteen custody factors delineated in 23 Pa.C.S. § 5328(a). We find that it was not.

Mother and Father were married in Utah. They were living in Halifax, Dauphin County, Pennsylvania, when Mother initiated this case by filing a complaint for custody on May 5, 2016. Mother also filed a notice of relocation to Utah to which Father filed a counter-affidavit and his own notice of relocation to Franklin County, Pennsylvania, to which Mother filed a counter-affidavit. The trial court entered an agreed custody order in this matter on June 13, 2016, following a pre-trial conference. That order awarded Mother primary physical custody and awarded Father supervised visitation. The

parties shared legal custody. No one made an objection to this order and no one appealed from it. Mother filed a request for a full hearing on relocation on July 12, 2016, that the trial court scheduled for September 6, 2016.

Mother filed an emergency petition for special relief on August 2, 2016, in which she asked the trial court to, "enter an Order suspending Father's rights to supervised visitation until resolution of the pending criminal matter." (Mother's Petition for Special Relief, at 4 (unpaginated)). Mother sought to suspend Father's supervised visitation while the police investigated Mother's allegations that Father had acted inappropriately around the Children, allegations that had been investigated and deemed unfounded by Dauphin County Children and Youth Services. Mother filed a petition for protection from abuse (PFA) on August 4, 2016, that she based on the allegations in her petition for special relief. The trial court denied Mother's petition for special relief on August 5, 2106. The trial court held hearings on Mother's PFA petition and the two relocation requests on September 6, 2016, January 6, 2017, and January 19, 2017. On February 17, 2017, the trial court entered the order complained of in which it denied Mother's request for relocation, approved Father's request, and resolved Mother's PFA by defining Father's supervised visitation.

The order of February 17, 2017 provides that the parties shall share legal custody, Mother shall have primary physical custody and that Father shall have supervised visitation two days per week at a specified location.

According to the trial court, "The February 15, 2017 Order did not alter the custody that had been previously entered aside from the location of the supervised visitation - Mother was provided primary custody, and Father supervised visitation at ABC House at least once per week – pending resolution of the criminal charges." (Trial Court Pa.R.A.P. 1925(a) Opinion, 4/18/17, at 4). Thus, in addressing the question of custody, the order denies Mother's PFA and preserves the *status quo ante* established when the trial court entered the original custody order on June 13, 2016, with the exception of the subsidiary issue of how Father is to exercise supervised visitation. The trial court did not make any award of custody that did not already exist. In its Memorandum in support of its order entered February 17, 2017, the trial court addresses the relocation factors in section 23 Pa.C.S.A. §5337(h), but did not discuss the sixteen custody factors listed in 23 Pa.C.S.A. §5328(a). Mother claims that this was error. We disagree.

This Court has said "[A] trial court must apply the § 5328(a) factors and issue a written explanation of its decision when it orders any of the seven forms of custody provided for by the [Child Custody] Act." **S.W.D. v. S.A.R.**, 96 A.3d 396, 402 (Pa. Super. 2014). The seven forms of custody provided for by the Act are:

> **(a) Types of award**.--After considering the factors set forth in section 5328 (relating to factors to consider when awarding custody), the court may award any of the following types of custody if it is in the best interest of the child:
>
> **(b)**

(1) Shared physical custody.

(2) Primary physical custody.

(3) Partial physical custody.

(4) Sole physical custody.

(5) Supervised physical custody.

(6) Shared legal custody.

(7) Sole legal custody.

23 Pa.C.S.A. § 5328(b).

In her brief, Mother claims, "The law clearly requires the [trial] court to consider all Custody Factors when ordering any form of custody; no change is required to trigger the court's obligation to place it's reasoning on the record." (Mother's Brief, at 12-13). Mother clearly misreads our law, which requires a trial court to consider the custody factors only when awarding any of the seven forms of custody listed above. In this case, the trial court addressed only the subsidiary issue of Father's supervised visitation.

This Court addressed a similar set of facts in *M.O. v. J.T.R.*, 85 A.3d 1058 (Pa. Super. 2014). In *M.O.*, the father filed a petition for modification. At a pre-trial conference, the parties resolved all the issues except a question relating to the father's summer visitation. The trial court held a hearing in which the parties addressed that one subsidiary issue, after which the trial court issued an order of custody without discussing the sixteen custody factors. Mother appealed,

claiming that it was error not to address those issues. This Court

disagreed, stating:

> Following the hearing in this case, the trial court made no award of custody. The court was not deciding physical or legal custody, nor even changing the amount of custodial time that either party had with the Children. Rather, the trial court addressed a subsidiary issue: whether Father was required to be off from work while the Children stayed with him for a portion of the summer. After hearing the evidence that the parties presented limited to that sole issue, the trial court decided that Father could work during the three weeks in question. While the court's ruling modified its prior order, it did not change the underlying award of custody. Therefore, under the facts of this case, Section 5328(a) was not implicated directly.

*Id.* at 1062-63.

The case before us is similar to **M.O**. Here, the parties agreed to an

order of custody at a pre-trial conference and the trial court entered an order

based on that agreement. By filing her PFA, Mother sought to modify the

order by restricting Father's visitation. When it entered the order complained

of, the trial court did not change the underlying award of custody, and did not

award any form of custody that either party did not enjoy prior to the

relocation/PFA hearing; it simply resolved the subsidiary issue of Father's

supervised visitation and thus section 5328(a) was not implicated directly.

**M.O.**, **supra**. [2]

---

[2] We are aware of this Court's opinion in **A.V. v. S.T.**, 87 A.3d 818 (Pa. Super. 2014). However, **A.V.** involved a direct modification of the "type" of custody (from shared physical to partial physical custody) and substantially reduced Father's time with the children, and thus we find it distinguishable.

As to the remaining issues, we have carefully reviewed the trial court's Memorandum Opinion filed February 15, 2017, and in its Opinion Pursuant to Pa.R.A.P. 1925(a) entered April 17, 2017, and we find them, taken together, to be a correct and complete analysis of the remaining issues Mother raises on appeal. Accordingly, we affirm the order of the trial court entered February 15, 2017, on the basis of those opinions.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/24/2017

|  |  |  |
|---|---|---|
| **Plaintiff** | : | IN THE COURT OF COMMON PLEAS OF |
|  | : | DAUPHIN COUNTY, PENNSYLVANIA |
|  | : |  |
| v. | : | NO. 2016 CV 3466 CU |
|  | : |  |
|  | : | CIVIL ACTION – LAW |
| **Defendant** | : | IN CUSTODY |

## MEMORANDUM OPINION

The instant matter was initiated on May 5, 2016, upon the filing of a Complaint for Custody by Plaintiff ████████ (hereinafter "Mother") naming Defendant ████████ (hereinafter "Father"), and seeking primary physical custody of their minor children, M.K. (12/2009), E.K. (5/2014), and A.K. (6/2016)[1].

On May 20, 2016, Father filed a Counter-Affidavit Regarding Relocation objecting to Mother's proposed relocation, and requested a hearing prior to allowing the children to relocate. Father then filed a Notice of Proposed Relocation on May 26, 2016, requesting permission for the children to relocate to Waynesboro, Franklin County, Pennsylvania where he and paternal grandparents currently reside. Thereafter, Mother filed a Motion for Full Expedited Hearing on Relocation, as well as a Counter-Affidavit Regarding Relocating objecting to Father's proposed relocation. This Court scheduled a pretrial conference for June 13, 2016.

Prior to the filing of the Complaint, a referral for possible sexual abuse of the children was made to Dauphin County Children and Youth Services (hereinafter "DCCYS"). On April 14, 2016, DCCYS Caseworker Autumn Ricker (hereinafter "Caseworker Ricker") and Trooper Raschard Buie (hereinafter "Trooper Buie")

---

[1] A.K. was born during the pendency of this action. He was not originally named in the Complaint as it was filed prior to his birth.

interviewed Mother at her residence, who stated that she knew Father had been diagnosed with Obsessive Compulsive Disorder (hereinafter "OCD"), but after the birth of M.K. in 2009, Father began to act "very weird". In addition, she stated the following:

> [T]hat as a result she became very concerned with [Father's] behavior and asked him what was going on. [Father] explained to her that his "OCD" was related to a sexual orientation that he has towards children. She stated that [Father] will often blurt aloud such phrases as, "No! No!" and "Stop It" to get "thoughts" out of his head. She stated that she was overly concerned but [Father] assured her that he had it "under control".

> ****

> [Mother] stated that [Father] likes to "repeatedly" kiss their daughters on the lips. She stated that her father was visiting and observed [Father] give MCK a prolonged kiss which "freaked" her father out. She confronted [Father] after this incident and related to him that she was not comfortable with him kissing MCK & EK in this manner and [Father] stated, "it makes me feel good and I'm not stopping".

> [Mother] stated that as recent as March 17th, 2016 [Father] was snuggling on the couch with EK in the living room and she heard "kissing noises" and came into the room to see what was going on. She began to feel awkward and uncomfortable and asked [Father] to stop. He refused and again stated, "it makes me feel good". He continued to do the lip kisses and she again asked him to stop and he again refused. She stayed in the living room to closely observe the situation. As [Father] continued to snuggle with their daughter on the couch he made the statement, "I'm becoming aroused sitting here with our daughter". [Father] asked her if he was "being bad". After this incident she feared for the safety and protection of her children as [Father] has never been "so blunt and bold in his description".

> [Mother] stated that [Father] seeks validation for his feelings and behaviors and often asks her if he is doing something wrong or "am I ok?" She stated that she was not going to validate his feelings after this incident and stated, "████, only you know what you are feeling and thinking, so only you know if your behavior is inappropriate." [Father] became frustrated

and stated, "What", "I'm just asking for your support; I just need your support". She then picked up EK and put EK and MCK to bed for the night.

*See* Police Criminal Complaint, August 2, 2016, Incident Number PA16-104545.

That same day, Caseworker Ricker and Trooper Buie conducted a preliminary interview of Father wherein he stated the following:

> He conducted a religious "mission" trip years ago and was informed that he could not "touch, put kids on laps, or show affection to children" as a rule while on the mission. He has had problems getting close to MCK and EK ever since the conclusion of his mission trip and only recently has he been able to establish a relationship with MCK and EK. [Father] stated that he may "bump" into MCK and because "it's his OCD" he then asks MCK if he "bumped" into her and apologizes.

> . . . [Father] asked if he could "give the kids some candy" prior to him leaving the residence. [Trooper Buie and Caseworker Ricker] advised [Father] that he could give MCK and EK candy before leaving the residence. Upon, leaving the residence, [Father] stated to MCK, "give daddy a hug". As MCK approached [Father], [Trooper Buie] observed her to attempt to kiss [Father] on the lips and [Father] turned his head to the side and stated, "no honey ..... on the cheek". MCK kissed [Father] on the cheek and [Father] subsequently left the residence.

*See* Police Criminal Complaint, August 2, 2016, Incident Number PA16-104545. Father agreed to leave the marital residence and have no contact with the children for thirty (30) days pursuant to a safety plan which prevented the children from being placed in foster care. On April 18, 2016, the Honorable John F. Cherry confirmed the safety plan. On May 14, 2016, the safety plan expired without incident. After an investigation by DCCYS, which included an interview of M.K. at the Children's Resource Center that yielded no disclosures, the allegations were determined to be unfounded as of June 13, 2016.

Following the pretrial conference on June 13, 2016, the parties agreed that Father would undergo a § 5329 assessment, and Mother would complete the Minnesota Multiphasic Personality Inventory II ("MMPI-II"), both to be conducted by Laurie Pittman at Beacon Psychological. In addition, this Court ordered primary physical custody of the children remain with Mother, and permitted Father to have supervised visitation with the children at the YWCA, as well as visit with his newborn son in the hospital.[2] On July 12, 2016, Mother filed a Renewed Motion for Full Expedited Hearing on Relocation, and this Court subsequently scheduled a hearing for September 6, 2016.

On August 2, 2016, prior to the scheduled hearing, Mother filed a Petition to Modify Custody, as well as an Emergency Petition for Special Relief. The Emergency Petition stated that criminal charges were formally brought against Father on August 2, 2016, and requested Father's periods of supervised visitation be suspended pending resolution of the criminal charges.[3] Despite the request, Father's periods of supervised visitation had yet to begin. Two days later, on August 4, 2016, Mother filed a Petition for Protection from Abuse ("PFA") raising the same allegations that were investigated and deemed unfounded by DCCYS, are currently being investigated by the Pennsylvania State Police, and that were raised as the basis for the Emergency Petition. A temporary protection order was granted protecting Mother and the three (3) minor children. Mother's Emergency Petition was subsequently denied by this Court on August 5, 2016. Since this

---

[2] *See* Order of June 13, 2016.

[3] Father was originally charged with two (2) counts of Indecent Assault (M1), two (2) counts of Corruption of Minors (M1), and two (2) counts of Unlawful Contact With Minor – Sexual Offenses (F3). The two (2) counts of Unlawful Contact with Minor were subsequently withdrawn, and the remaining charges have been bound over for court. The case is currently scheduled for miscellaneous court on April 5, 2017 before the Honorable Scott A. Evans. CP-22-CR-6909-2016.

Court is assigned the custody action, we were also assigned the PFA action as the two are interrelated.

On August 16, 2016, Father filed a Petition for Special Relief stating that the parties attempted to begin supervised visitations at the YWCA, but were told that the YWCA could not facilitate visits for the family and were referred to two (2) other entities – Catholic Charities and Alternative Behavior Consultants ("ABC") House. It further stated that Mother refused to agree on Catholic Charities, and requested an Order requiring Mother to make the children available for a minimum of two (2) supervised visits per week. Thereafter, this Court conducted a status conference on September 1, 2016 with counsel for the parties and subsequently ordered supervised visitation between Father and the children to occur at ABC House by agreement of the parties.[4]

On September 6, 2016, this Court conducted a PFA and relocation hearing in which both parties testified. In addition, we heard testimony from Christina Masser (M.K.'s kindergarten teacher), Trooper Buie, Caseworker Ricker, Dr. Laurie Pittman (forensic psychologist), Carla Sauer (principal at Halifax Elementary School), Dr. Dwayne Narayan (Father's psychiatrist), ██████████████ (Maternal Grandfather), ████████ ██████████ (Maternal Aunt), and ████████████████ (Paternal Aunt). At the conclusion of the testimony pertinent to the allegations of abuse, this Court dismissed Mother's PFA since adequate safety protocols were already in place and the PFA would serve no further purpose.

Dr. Laurie Pittman (hereinafter "Dr. Pittman") is a forensic psychologist who conducted a risk assessment of Father, and a MMPI-II evaluation of Mother. While Dr.

---

[4] *See* Order of September 1, 2016.

Pittman is a highly qualified and well-regarded professional in the area, her testimony in this particular case appears to this Court to be possibly biased. Mother and her family raised a concern about Father's potential hoarding and provided Dr. Pittman with several pictures from a trailer that the parties lived in between 2011 and 2013. (Notes of Testimony, Custody Hearing 9/6/16 (hereinafter "N.T. 9/6/16") at 89). Throughout her report of Father, Dr. Pittman repeatedly mentions the issue of hoarding when there does not appear to be a relevant context in which to mention it. For example, in reporting on her interview with ██████████ (Paternal Aunt), she writes:

> ████████ also recalls on another occasion they went to the mall to purchase a pair of jeans for ████ but ████████ reported, "No, I don't think we can do that today."

> **This evaluator realizes that what is not indicated here is ████████ compulsive spending on "toys" and other collections and that ██████ resents ████████ not prioritizing the physical safety of the children given his hoarding.**

See Plaintiff's Exhibit 4, Psychological Report of ████████████████████ authored by Dr. Laurie Pittman, 6/30/2016 at p. 35. Later in the report, Dr. Pittman writes of ████████ recollection of meeting Maternal Grandfather on four (4) occasions. Immediately following the paragraph regarding ████████ impression of Maternal Grandfather, Dr. Pittman writes: "In the phone interviews with ████████ father as well as ████████ sister ████████ they report of extreme discomfort for ████████ as well as his father's hoarding." See Psychological Report of ████████████████████ authored by Dr. Laurie Pittman, 6/30/2016 at p. 36. Despite Dr. Pittman's apparent belief that the alleged hoarding creates a significant concern with Father's ability to have unsupervised contact with the children, as well as the safety of the children, Dr. Pittman admitted that

she did not question Father or his family about the alleged hoarding. (N.T. 9/6/16 at 103-104).

During our proceedings, Father and his family testified extensively about the hoarding allegations. Their testimony revealed that both Father and Mother had hoarding tendencies, and the pictures provided to Dr. Pittman conveniently did not depict Mother's portion of the clutter. The testimony also revealed that neither Father nor Mother were exceptional housekeepers, and the combination of the two is what led to the "deplorable" living conditions as described by Maternal Grandfather. (Notes of Testimony, Custody Hearing 1/6/17 (hereinafter "N.T. 1/6/17") at 115-16). In addition, the pictures provided to Dr. Pittman were taken after the parties moved from Virginia to Pennsylvania, and the parties were initially residing in Paternal Grandparents' home while the trailer was being finished for the parties. (N.T. 1/6/17 at 114). However, when Paternal Grandparents' asked the parties to contribute by taking on some of the household tasks, Mother adamantly refused and demanded that they leave Paternal Grandparent's home immediately and caused the parties to move into the trailer prematurely. (N.T. 1/6/17 at 114-15).

In addition, Dr. Pittman testified that she believes that Father's family were not truth-telling. (N.T. 9/6/16 at 89, 95). Her opinion is based on the fact that "they were not giving me the full picture of what was going on via the interactions that ██████Father was trying to have with ██████, with ██████ They had a tendency to provide a lot of

---

[5] Dr. Pittman is referring to Father's statement that Maternal Grandfather is controlling and he had several conversations with Maternal Grandfather regarding money, and Maternal Grandfather's disappointment with Father for not earning enough money. In contrast, Maternal Grandfather stated to Dr. Pittman that he was merely concerned about the safety of the children due to the alleged hoarding, and attempts to discuss it with Father were unsuccessful. Notably, Maternal Grandfather testified that he never brought up the hoarding issue directly to Father because he wanted to respect their privacy. (N.T. 9/6/16 at 217).

indications of where I should be looking at ████████, not at ██████████" (N.T. 9/6/16 at 89). She further testified, "[n]obody talked about the hoarding. They talked about the father-in-law coming across as cold and as snobbish. They were not talking about the fact that ████████ and ████████ first lived in a trailer without an operable stove." (N.T. 9/6/16 at 96). As stated earlier, despite Dr. Pittman's apparent fixation on the hoarding issue, and Father and his family's failure to talk about it, Dr. Pittman failed to ask Father or any of his family members about the alleged allegations.

In contrast, Dr. Pittman believed Mother's family was very truthful and forthcoming. This is troubling to the Court as the testimony in our proceedings revealed that Father's family has always been extremely involved in caring for the minor children, and would frequently visit the parties wherever they were living. As Mother's family primarily resides in Utah, Maternal Grandfather admitted that they would only visit the parties once or twice a year for approximately one (1) week at a time. (N.T. 9/6/16 at 199). ████████████ (Maternal Aunt) also lives in Utah and stated that she visits approximately five (5) times a year, for a total of one hundred (100) days in the past ten (10) years. (N.T. 9/6/16 at 227, 233-34).

Despite Father's family having more personal contact and observation of the parties and the minor children, Dr. Pittman dismissed their concerns of Mother because she felt they were not providing "the full picture". Yet, she found that Mother's family, who infrequently visited with the family and had minimal involvement with the minor children on those visits, was providing "the full picture". Further, Dr. Pittman admitted that she asked Mother to respond to certain allegations that Father or his family reported.

Maternal Grandfather also admitted that he "suggested" to Father that Father needed to earn more money to "improve his lifestyle and also enhance his family's." (N.T. 9/6/16 at 216).

However, she did ask Father to respond to any of the allegations that Mother or her family reported, especially the allegations of hoarding and a show-and-tell incident at M.K.'s school – both of which Dr. Pittman found to be significant in her evaluation of Father. Accordingly, this Court finds Dr. Pittman's report to be disturbingly subjective. This Court's observation was ratified by Dr. Narayan's testimony where he challenged the methodology and conclusions of Dr. Pittman's report.

We also heard testimony from Father's psychiatrist, Dr. Dwayne Narayan. Dr. Narayan is a general adult psychiatrist who specializes in the treatment of Obsessive-Compulsive Disorder ("OCD"), anxiety disorders, body image and eating disorders, depression, and bipolar disorder. He shared the same concerns as this Court with Dr. Pittman's methodology:

> I find Dr. Pittman's report very difficult to follow. . . . [S]he does do a number of interviews or evaluations of people, and they are written as if it's just a running commentary . . . – she calls someone, they say all this stuff over the phone, she writes it down almost as if they're saying it, doesn't seem to be a question-and-answer like I would hope. And I'm not a forensic psychologist, but I would hope that anyone doing an evaluation would ask a question. Say, I wanted to get this information; what was their response to it? Really outlined in an organized way. Her presentation does not read like that.
> And then you get these bold-faced additions or comments refuting or adding some comment to a particular person's interview that had nothing to do with that interview. And, again, strictly speaking, you want to put the information that you're getting from the outside – you want to get your data in one section and then do a formulation, do an assessment of that data in another section so it's clear. . . . Get my data, synthesize it, present a conclusion. I'm not sure what she was doing with these interviews.

(N.T. 9/6/16 at 142-43).

As for his treatment of Father, Dr. Narayan first met him in 2002 and treated him for OCD and depression until 2003 when Dr. Narayan left that practice. Father began seeing Dr. Narayan again in 2016 after the allegations were made to DCCYS. Dr. Narayn provided the following explanation of OCD:

> OCD is a psychiatric illness where one gets repetitive, intrusive thoughts that cause distress, that are not logical thoughts in the strict sense of the word, but they are thoughts that are extremely unlikely to happen. . . . The reaction to those thoughts is one of very, very high levels of anxiety or one trying to convince themselves that they're in their right mind, which is not particularly easy to do when you're in a heightened anxiety state. In order to soothe the anxiety, people go through what we call compulsive behaviors. Compulsive thinking, compulsive checking, compulsive cleaning. Some compulsions designed to reduce the anxiety brought on by these intrusive thoughts. And then what you see after that is a cycle of having more and more obsessive thoughts, thoughts they don't want to have, thoughts that – we call them ego-dystonicity. They're against their character, their beliefs. They do not make sense. They are thoughts that they don't want to have. They're fearful of even having the thoughts. And, again, that generates more of the compulsive behaviors trying to deal with that anxiety.
>
> The only benefit of a compulsion is to lower the anxiety so that one can go on with a normal life. Unfortunately for people that suffer from the illness, they end up experiencing more and more obsessional thoughts each time they do a compulsion. So each time you have a compulsion, it drives the underlying obsession and keeping [sic] going and going.

(N.T. 9/6/16 at 126-27). With respect to Father's specific diagnosis of OCD, Dr. Narayan testified:

> With his children, he would describe . . . that they would latch onto him, as all kids do. . . . [Y]ou're trying to put a kid to bed, and you give them a kiss good time, it's extremely common for kids just to say, well, I'm going to hold on. I don't want to go to sleep. I want to give you a longer kiss. Well, what that does for ▬▬▬▬ is that it would trigger the worry of, well, first of all, it doesn't feel right. Every parent wants to put

their kid to bed and move on. And that is the reaction we would hope that he would have, the reaction that the rest of us would have. His brain then says, oh, – rather than having that feeling – oh, did I do something inappropriate? Did I feel something inappropriate? What – was I aroused? . . . And he will go right to the worst case scenario. Gosh, I had the sensation. I think I was aroused, but I'm not sure. Again, logically he knows he wasn't. He knows he's disgusted by any idea of having any sort of sexually inappropriate contact with a kid. He's very clear about that. But his worry side, it's very consistent with OCD. It's textbook.

(N.T. 9/6/16 at 132-33). This explanation tends to confirm Father's testimony regarding the March 17, 2016 incident:

First of all, there was never more than one kiss. ▮▮▮▮ and I were in the same room from the very beginning. . . . [E.K.] climbed up on the couch while ▮▮▮▮ and I were talking, hopped on my lap, wrapped her arms around my neck, and planted a big kiss on my lips. . . . You know, because we all kissed on the lips. We all did. [E.K.] didn't let go, and I started to become a little nervous. . . . So when [E.K.] climbed on my lap, I had a panic attack that maybe something was happening because maybe it was bad because we weren't allowed to have kids on our laps there. I froze. I looked at my wife, and I said – when [E.K.] wouldn't let go – I said, can you take her? And she glared at me and didn't take her. And I said, honey, can you take her? And she wouldn't take her. . . . I eventually pulled her arms off from around my neck and I sat her beside me. And I told ▮▮▮▮ that I had a fear that maybe I was become aroused. I never said I was, and, quite frankly, I wasn't. I never have ever been aroused by a child ever. But it's the fear of the possibility with OCD.

(N.T. 1/6/17 at 144-45). Dr. Narayan went on to explain that there is a zero likelihood that an individual diagnosed with OCD would ever act on their fear. (N.T. 9/6/16 at 129). Specifically, Dr. Narayan testified that he can say with reasonable medical certainty that Father would not harm his children in any way. (N.T. 9/6/16 at 138).

The primary form of treatment of OCD is cognitive behavioral psychotherapy which teaches you strategies to eliminate the compulsions, such as desensitization. (Id.) Dr. Narayan provided the following example of this type of treatment:

> [S]omeone who has a fear of, say, stabbing me. A patient comes to my office. They said, "I just got this thought. It's not that I want to have it, but I worry that I might stab you." What we try to do is desensitize the thought, get them comfortable with the idea that the thought is error. . . .
> But what someone with OCD might do is try any way possible to not touch a knife. So we would bring the knives into the therapy, and it is commonplace for us to have people imagine the knives on the table, and . . . get used to that. That will cause anxiety for them. If they tolerate that, we'll put knives on the table in real life and get them to sit there and say, well, now, where are your thoughts? You've having to learn to sit with those thoughts now. They will go away over time. They will desensitize. And once that happens, that fear is no longer there.

(N.T. 9/6/16 at 129-30). Although Dr. Narayan testified that Father was taught some of the techniques for treating OCD, he admitted that Father was not handling his OCD properly by asking Mother for reassurance for his behaviors. (N.T. 9/6/16 at 134). Each time that Father asked Mother for reassurance, it made him less secure the next time a thought would come up. (N.T. 9/6/16 at 135). Dr. Narayan testified that a spouse can only put up with so much of that type of coping mechanism before they say it is craziness. (N.T. 9/6/16 at 134). He stated that Father cannot continue to use reassurance as a way of dealing with his OCD, and that will be addressed in therapy. (N.T. 9/6/16 at 153). For Father, Dr. Narayan's treatment goal is for him to be comfortable appropriately kissing his children as a parent. (N.T. 9/6/16 at 135).

With respect to hoarding, Dr. Narayan testified that hoarding is a medical problem. (N.T. 9/6/16 at 139). However, it cannot be diagnosed without talking to the patient. (N.T.

9/6/16 at 141). He said it would be "difficult to diagnosis just based on a set of pictures without additional information." (Id.) Aside from talking to the patient, Dr. Narayan would also go and view the entire home and see where things are before making a diagnosis of hoarding. (Id.)

Since we were unable to complete the testimony on September 6, 2016, a second (2nd) day of the relocation hearing was scheduled for October 20, 2016. On October 11, 2016, Father filed a Motion for Continuance due to the preliminary hearing on his criminal being was continued until November. In addition, Father had only had one (1) supervised visit at that time and had hoped to have a few more visits prior to the next session of the relocation hearing. This Court granted Father's request, and the relocation hearing was continued until January 6, 2017.[6]

On November 30, 2016, Father filed a Petition for Special Relief and Request for Expedited Hearing alleging that Mother had unilaterally cancelled a number of supervised visits, and requesting an order requiring Mother to cooperate in ensuring the visits occur. Due to the contentious nature of this action, this Court scheduled an emergency hearing for December 9, 2016. At that hearing, we learned that Father had a total of three (3) supervised visits at ABC House – October 1, 14, and 29, 2016 – and all other visits were cancelled with no make-up days scheduled.[7] At the conclusion of the hearing, the Court ordered supervised visitation to restart and to occur at least once every other week. It

---

[6] Mother filed a Motion for Reconsideration of our order continuing the hearing due to the fact that she objected to the continuance and did not have an opportunity to respond pursuant to Pennsylvania Rule of Civil Procedure 208.3 and Dauphin County Local Rule 208.3(b). This Court denied Mother's request stating that Pennsylvania Rule of Civil Procedure 208.1(2)(iii) specifically states that the procedure for motions, contested or uncontested, does not apply to family law actions.
[7] See discussions under factor 5 below.

was also ordered that a visit was to occur around the Christmas holiday, and that the Paternal Grandparents could attend.[8]

Our next hearing in this saga occurred on January 6, 2017, at which time we heard testimony from Robin Snyder (supervisor at ABC House), Mother (completion of her original testimony), ███████████ (Father's co-worker and friend), ███████████ (Father's co-worker and friend), ███████████ (Paternal Aunt), ███████████ (Paternal Grandfather), and Father. The final hearing occurred on January 19, 2017 at which time Father concluded his testimony and Mother was called for rebuttal.

## DISCUSSION

Before this Court is Mother's Complaint for Custody and request to relocate the minor children to Utah, as well as Father's request to relocate the minor children to Franklin County, Pennsylvania. In addition to reviewing the record, we have heard testimony from both parties, and their respective witnesses. We have weighed the evidence in light of the presumptions concerning primary physical custody and burdens that apply to each of the parties under the Child Custody Act. 23 Pa.C.S.A. § 5327(a)-(b).

Pursuant to the current Child Custody Act, before making any custodial award, the Court must determine "the best interests of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child," including the sixteen (16) statutorily defined factors, and ten (10) relocation factors. 23 Pa.C.S.A. §§ 5328(a), 5337(g); see J.R.M. v. J.E.A., 33 A.2d 647, 652 (Pa. Super. 2011).

---

[8] Testimony at the hearing revealed that Mother denied Paternal Grandparents supervised visitation at ABC House. (N.T. 12/9/16 at 54-55).

Due to Father's pending criminal charges and Mother's expressed intent to relocate to Utah, this Court has only considered the relocation factors.

**RELOCATION FACTORS**

(1) *The nature, quality, extent of involvement and duration of the children's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the children's lives.*

There is conflicting testimony regarding Father's involvement with the children during the parties' marriage. Mother testified that she primarily cared for the children, and Father only cared for the children while she was working. (N.T. 9/6/16 at 247). She further stated that Father had little interaction with the children as he did not help with meals, clean, change diapers, etc. because he would be tinkering with stuff in the garage, sleeping, or on his cell phone. (N.T. 9/6/16 at 249). However, Mother also testified that she and the children would visit Father at his second (2nd) job every night for dinner so that Father could tell the children good night. (N.T. 9/6/16 at 248). She testified that Father was never able to have a "normal" relationship with the children and she always acted as a go-between. (N.T. 1/6/17 at 74).

According to Father, when M.K. was first born the parties worked opposite shifts, therefore, both parties cared for M.K. (N.T. 1/6/17 at 138). He further testified that Mother always asked him to care for the children, and never voiced a concern with his ability to do so. (N.T. 1/6/17 at 139-41). He has attended school events and parent-teacher meetings for M.K., and he has taken both of the girls to the doctors on several occasions. (N.T. 1/6/17 at 151, 156-57).

Both parties admit that Paternal Grandparents, as well as Paternal Aunt (Mrs. ▓▓▓▓ and her daughter, ▓▓▓▓, have been a significant factor in the children's lives.

Paternal Grandparents and Mrs. ▆▆▆ visited the parties approximately twice a month when they lived in Virginia. (N.T. 1/6/17 at 95-96, 112). When they moved to Pennsylvania, the parties resided on Paternal Grandparents' property. (N.T. 1/6/17 at 114). During that time, Paternal Grandparents babysat M.K. approximately six (6) times a week. (N.T. 1/6/17 at 116). In addition, Mrs. ▆▆▆ visited approximately five (5) to six (6) times a week and helped with babysitting. (N.T. 1/6/17 at 94). When the parties moved to Halifax, Paternal Grandparents and Ms. ▆▆▆ visited approximately two (2) to three (3) times a month. (N.T. 1/6/17 at 93, 118). Ms. ▆▆▆ testified that ▆▆▆ misses M.K. very much as Mother did not allow them to contact the children.[9] (N.T. 1/6/17 at 107).

(2) *The age, developmental stage, needs of the children and the likely impact the relocation will have on the children's physical, educational and emotional development, taking into consideration any special needs of the children.*

The children are M.K. (age 7), E.K. (age 2 ½), and A.K. (age 7 months). The parties moved to Pennsylvania when M.K. was approximately two (2) years old, and have resided in Halifax since 2013. According to Maternal Grandfather's testimony, a relocation would be positive for the children because they would be removed from what he deems an unsafe environment (OCD and hoarding) and would live a "normal" life. (N.T. 9/6/16 at 212). Mother testified that she and the children would have a support network in Utah as she currently does not have one in Pennsylvania. (N.T. 1/6/17 at 75). The Court notes that the combined testimony of all the proceedings in this case indicate that Father's family did provide a support network for Mother in Pennsylvania, however, she elected to sever that relationship.

---

[9] At our last hearing on January 19, 2017, Mother testified that she made efforts to contact Paternal Grandparents and Paternal Aunt after this Court admonished her for cutting off all contact.

There was no testimony provided as to what school district and school M.K. would be attend if permitted to relocate, and how that school compares to her current school. Mother did testify that her family would provide free daycare for E.K. and A.K. in Utah. (N.T. 9/6/16 at 250).

(3) *The feasibility of preserving the relationship between the nonrelocating party and the children through suitable custody arrangements, considering the logistics and financial circumstances of the parties.*

Mother testified that she does not believe Father's relationship with the children would be significantly impaired if she relocated to Utah. Specifically, she stated "[w]hether the supervision happens here or in Utah, it doesn't really matter. It's just a matter of location. I mean, he's got supervised visitation." (N.T. 1/6/17 at 72). However, she also admitted that neither she nor Father have the funds to fly to Utah regularly for the visitations to occur. (Id.) She stated that the Renaissance Child Visitation Center in Salt Lake City, Utah would provide supervised visits between Father and the children. (N.T. 1/6/17 at 49). The center is located about halfway between Ms. ███████████ (Paternal Aunt) home and Maternal Grandparents home – approximately an hour and a half (1 ½) drive. (N.T. 1/6/17 at 49-50). She testified that Father visits at least one (1) time a year, has work connections in Utah, and the Church headquarters is located in Utah. (Id.) She further testified that Father could visit any time in Utah so long as it does not interfere with M.K.'s school or extra-curricular activities. (N.T. 1/6/17 at 50).

Father is fearful that if Mother is permitted to relocate to Utah, the children will lose their father. He already has difficulty maintaining consistent supervised visitations in Pennsylvania, and is concerned about the logistics and feasibility of maintaining contact with the children if they are in Utah. Further, Mother has contacted the children's medical

providers in Pennsylvania and M.K.'s school to inform them not to release any information to Father without her consent.

(4) *The children's preference, taking into consideration the age and maturity of the children.*

By agreement this Court did not interview the children because of their young age.

(5) *Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the children and the other party.*

There was significant testimony indicating that Mother is attempting to thwart Father's relationship with the children. Mother first asked Father to relocate as a family to Utah beginning on or about May 2015. (N.T. 1/6/17 at 51, 142). Father testified that Mother expressed a strong desire to return to Utah because she wanted Father to make more money and live in a bigger home. (N.T. 1/6/17 at 142). Father did not want to move because they had just purchased a home, he was happy with his job, and they had already moved four (4) times during their marriage. (N.T. 1/6/17 at 142-43). Mother became upset, and according to Father, the request to move to Utah became a constant issue between the parties. (N.T. 1/6/17 at 143). Despite Mother's testimony that she had been afraid of Father for a number of years during their marriage, she admitted that she never told anyone about her alleged fear until after Father said "no" to moving to Utah during an argument on or about March 13, 2016. (N.T. 9/6/16 at 54-55). The DCCYS investigation, which was subsequently unfounded, and the criminal charges were brought solely based upon Mother's perception of the March 17, 2016 incident (i.e., there were no disclosures made by a child, there was no physical evidence, and no actual observed criminal acts).

Further, Mother sent Father the following text message on May 10, 2016:

I know that spending time with our son in the hospital is important to you and having your family there as well. I also know that being apart [sic] of naming him is important to you too. If you want to have these opportunities then I need you to sign the relocation paperwork because that is what is important to me. If you sign it then I won't have a need for either vehicle and you will get to keep them, otherwise I will try and get the truck because it's more reliable. The choice is yours. This is [sic] relocation is the most important thing to me and my ability to move forward. Please make this easy for both of us.

See N.T. 1/6/17 at 65-66; see also Defendant's Exhibit 21. Father did not comply with Mother's demands and as a result, neither Father nor his family were permitted in the hospital when A.K. was born, and Father did not have a say in naming their son. (N.T. 1/6/17 at 66-67).

In addition, Father was court-ordered to have supervised visitation with the minor children on June 13, 2016 at the YWCA.[10] Unfortunately, we learned at the pretrial conference on September 1, 2016, that the YWCA initially agreed to offer supervised visitations to the family. However, when they learned of the nature of Father's criminal charges, they declined to offer their services. The parties then tried Catholic Charities, who again initially agreed to offer their services, but once they learned of the nature of Father's charges they declined. Therefore, on September 1, 2016, we issued another Order providing Father with supervised visitations at ABC House in Carlisle.[11] Despite being permitted to have supervised visitation as early as June 13, 2016, Father did not have his first supervised visitation until October 1, 2016.

---

[10] See Order of June 13, 2016.
[11] The Court notes that there is no fee for supervised visitation at either the YWCA or Catholic Charities, but there is a fee for ABC House.

Prior to the first visit, Mother emailed ABC House to inform them of certain behaviors to look for in Father during the supervised visitation sessions. (Notes of Testimony, Special Relief Hearing, 12/9/16 (hereinafter "N.T. 12/9/16") at 32). According to Mother, ABC House agreed to intervene and document if and when the enumerated behaviors occurred. (N.T. 12/9/16 at 33). Following the first visit, Mother exchanged letters with Kim Sweger, Executive Director of ABC House, regarding her complaints about ABC House staff and their failure to comply with the rules.[12] According to Mother, ABC House staff repeatedly pressured the girls into visiting with Father after expressing discomfort in seeing him. (N.T. 12/9/16 at 35). Further, Mother felt that she had observed some of the enumerated behaviors in Father and was upset that ABC House did not document them. (N.T. 12/9/16 at 37-38).

According to Robin Snyder, the supervisor at ABC House, the first three (3) visits – October 1, 15, and 29 – went well and there was no violations of the visitation center rules or Mother's list of enumerated behaviors. (N.T. 1/6/17 at 12-13). The next visit was not until December 16, 2016, after our special relief hearing. Mother cancelled the November 12, 2016 visit with no reason given. (N.T. 1/6/17 at 16). Father subsequently learned that Mother cancelled because she did not have gas money. (N.T. 12/9/16 at 21). That visit was rescheduled to November 19, 2016, but was also cancelled by Mother because A.K. and E.K. were allegedly sick. (N.T. 12/9/16 at 20, N.T. 1/6/17 at 16). Father subsequently learned that despite the November 19th visit being cancelled, the children attended church the following day. (N.T. 12/9/16 at 20).

---

[12] *See* Father's Petition for Special Relief and Expedited Hearing, 11/30/16, Exhibits B, C, and D.

The next visit was scheduled for November 26, 2016. That visit was also cancelled by Mother because she had a prior commitment with her sister in Virginia.[13] (N.T. 12/9/16 at 55; N.T. 1/6/17 at 17). Robin asked Mother if she would make the visit up, and Mother responded that she was unavailable. (N.T. 1/6/17 at 17). The December 3, 2016 visit was cancelled because the children were allegedly sick again. (Id.) The next visit was December 16, 2016, but it was cut short due to an accident which caused Mother to arrive late. (Id.) On December 24, 2016, Paternal Grandparents accompanied Father for a Christmas visit with the children.[14] (N.T. 1/6/17 at 18). At the January 6, 2017 hearing, it was learned that no further visits were scheduled because Mother wanted to await the outcome of that hearing. (N.T. 1/6/17 at 20). At the final hearing on January 19, 2017, we learned that Father had two (2) more visits – January 7 and 17 – which also went well.

Mother also ceased all communication between the children and Father's family from April 2016 until January 2017 when this Court admonished Mother on the record for cutting off the children's access to extended family, specifically Father's family.

(6) *Whether the relocation will enhance the general quality of life <u>for the party seeking the relocation</u>, including, but not limited to, financial or emotional benefit or educational opportunity.*

Mother testified that the quality of her life would be enhanced if permitted to relocate to Mendon, Utah. (N.T. 9/6/16 at 249-50). Mother is currently unemployed and receiving child and spousal support from Father. She stated that it would be financially burdensome for her to remain in Pennsylvania because if she were to find employment,

---

[13] The November 26 visit was scheduled in October, but Mother did not inform Robin at that time that she had a prior commitment. (N.T. 1/6/17 at 17).

[14] Paternal Grandparents were required to apply for supervised visitation and to pay the $65 fee. (N.T. 1/6/17 at 18). They had previously applied for visitation at the end of October, but Mother refused. (N.T. 1/6/17 at 18-19).

at most she would be paid is $14 an hour. (N.T. 9/6/16 at 250-52). When factoring in childcare costs, her income, and support payments, she would not have enough total income to cover all of the necessary expenses, such as the mortgage, utilities and groceries. (N.T. 9/6/16 at 252-53). In addition, she testified that she would not be able to afford to return to school if she remains in Pennsylvania[15], nor would she be able to afford the childcare costs. (N.T. 9/6/16 at 254).

If permitted to relocate to Utah, Mother would live rent free with Maternal Grandparents while she finished her nursing degree. (N.T. 9/6/16 at 253). Once she obtained a nursing degree, then she would be able to work part-time for $33 an hour in Cash County Utah. (N.T. 9/6/16 at 253). In addition, Mother would have the benefit of emotional support in Utah as she needs to undergo extensive trauma therapy due to the nature of the marriage and how things have evolved. (N.T. 9/6/16 at 254). She testified that she would not be able to find childcare in order to attend the trauma sessions in Pennsylvania, and even if she did, once the therapy was completed she would return to her life and not have the benefit of Maternal Grandmother to give her a hug or watch the children while she meditates. (N.T. 9/6/16 at 254-55).

(7) *Whether the relocation will enhance the general quality of life for the children, including, but not limited to, financial or emotional benefit or educational opportunity.*

There was little significant testimony on this factor. Mother did not provide any information on which school district and the specific school M.K. would attend if permitted to relocate. E.K. and A.K. are not school aged yet. Mother did testify that she would be

---

[15] This Court is at somewhat of a loss as to how Mother would be able to afford school in Utah, but not in Pennsylvania. However, we can surmise that Maternal Grandparents would only pay for Mother to return to school in Utah, but not Pennsylvania.

able to provide for the children better emotionally, physically and spiritually in Utah. (N.T. 1/6/17 at 75-76). Aside from a few vague statements, there was no testimony or evidence that would show that a relocation would enhance the general quality of life for the children. However, relocation would further isolate the children from Father and Father's family.

(8) *The reasons and motivation of each party for seeking or opposing the relocation.*

Mother testified that her reasons for moving are to be closer to her family, financial stability, and an opportunity to gain an education. (N.T. 9/6/16 at 249-51). However, the testimony revealed that despite the financial ability to do so, Maternal Grandparents only visited once or twice a year and had minimal involvement with the children during those visits. (N.T. 1/6/17 at 150). Father's family appears to have extensive involvement in the upbringing of the children. While it is true that a relocation to Utah would be closer to Mother's family, it would be a significant distance away from Father's family in Pennsylvania.

Additionally, Father testified that Mother had always told him she had a better relationship with her parents when she lived far away from them. (N.T. 1/6/17 at 149-50). He also disputes the fact that Mother would not be able to obtain a nursing degree if she remained in Pennsylvania. There are several colleges in the Harrisburg area, as well as in Franklin County, that offer programs for nursing degrees, such as Penn State University (Middletown), Messiah College, Harrisburg Area Community College, Drexel University (Chambersburg), and Wilson College. (N.T. 1/6/17 at 159-60). Father adamantly opposes Mother's relocation to Utah because he is fearful that she will succeed in completely cutting him out of the children's lives.

(9) *The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the children or an abused party.*

Mother alleges that Father was emotional and sexually abusive towards her throughout the marriage. Father adamantly disputes the allegation and testified that both he and Mother initiated any intimate contact between them. Mother further alleges that Father is a risk of harm to the children due to his OCD and her belief that it is related to Father's sexual attraction to minors. This Court previously addressed this factor.

(10) *Any other factor affecting the best interest of the children.*

No other significant factors were considered.

**CONCLUSION**

After consideration of the matter and based upon our review of the statutory factors, this Court issues the following **ORDER**:

*(This space intentionally left blank.)*

|  | : | IN THE COURT OF COMMON PLEAS OF |
| **Plaintiff/Appellant** | : | DAUPHIN COUNTY, PENNSYLVANIA |
|  | : |  |
| v. | : | NO. 477 MDA 2017 |
|  | : |  |
|  | : | TRIAL COURT NO. 2016 CV 3466 CU |
| **Defendant/Appellee** | : |  |

## OPINION
### [Pursuant to Pa.R.A.P. 1925(a)]

Presently before this Court is the appeal of ▄▄▄▄▄▄▄ (hereinafter "Appellant" or "Mother") from this Court's Memorandum Opinion and Order of February 15, 2017, denying Mother's relocation and entering an interim order for custody pending the resolution of ▄▄▄▄▄▄▄ (hereinafter "Father" or "Appellee") criminal charges.

This Court believes that our Memorandum Opinion of February 15, 2017, as well as the transcripts and evidence of record, thoroughly explain the reasons for our decision. However, this Court will address some of the issues raised by Appellant in her Statement of Errors Complained of on Appeal.

Appellant filed a notice of appeal on March 17, 2017 – the last possible day in which the notice could be filed and considered timely. Simultaneously, Appellant filed a Statement of Errors Complained of on Appeal (hereinafter "Statement") pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i). However, this Court will not classify the Statement as being "concise" as required by the rules as it consists of eleven (11) main issues, ten (10) sub-issues, and spans a total of twelve (12) pages. In addition to the overwhelming length, the Statement is riddled with opinions and characterizations by counsel that are inappropriate, irrelevant, and some completely inaccurate. As much as this Court would like to find that Appellant has waived her issues for her failure to comply with the "concise" requirement, it cannot in good conscious do so because once

stripped of extraneous comments, opinions and extra verbiage, the issues are mostly

discernable.[1]

After removing counsel's extraneous comments, opinions, and extra verbiage, this

Court has discerned the following issues that we will address:

1. The Court erred by failing to address the custody factors enumerated at 23 Pa.C.S.A. § 5328(a).

2. The Court erred in disregarding the testimony of the agreed-upon expert, Dr. Laurie Pittman.

3. The Court erred by granting Father's request for relocation without considering any of the relocation factors enumerated at 23 Pa.C.S.A. § 5337.

4. The Court erred in awarding Paternal Grandparents visitation rights.

5. The Court erred by depriving Mother of her constitutional right to travel.

*See* Appellant's Statement of Errors Complained of on Appeal, March 17, 2016, para. 1, 3, 4, 10, and 11.

Appellant's remaining issues are mere dissatisfaction with this Court's decision,

and the Court's use of discretion in determining the credibility of witnesses and weight to

be afforded to each piece of evidence. Specifically, in Paragraph 8 of her Statement,

Appellant complains about ten (10) sentences from the discussion section of our

Memorandum Opinion. Appellant fails to set forth how the statements in Paragraph 2, as

well as Paragraphs 5-9 constitute an abuse of discretion. It is obvious Appellant is

dissatisfied with this Court's conclusions, however, that is not a proper basis for appeal.

---

[1] *See* <u>Donough v. Lincole Elec. Co.</u>, 936 A.2d 52 (Pa. Super. 2007).

## DISCUSSION

In reviewing a custody order, the Superior Court's scope is of the broadest type and the standard of review is abuse of discretion.

> We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

J.R.M. v. J.E.A., 33 A.3d 647, 660 (Pa. Super. 2011).

The Court notes that Appellant is correct in that we did not include a discussion of the custody factors at 23 Pa.C.S.A. § 5328(a) in our Memorandum Opinion. However, the reason behind the decision is one of common sense – the Court did not change custody, and the order is intended to be an interim order until Father's criminal charges are resolved.

The circumstances of this case are peculiar, and leave a number of unanswered questions pertinent to a final custody decision. Father currently has criminal charges pending from an incident that occurred on or about March 17, 2016. However, Dauphin County Children and Youth Services ("DCCYS") did not get involved regarding the incident until on or about April 14, 2016. As explained in greater detail in our Memorandum Opinion, the charges are based solely upon Mother's statements to Pennsylvania State Police Trooper Raschard Buie as to her perception and belief as what did or did not occur. The DCCYS investigation was determined unfounded on June 13,

2016. The criminal charges were not brought until about August 4, 2016 based upon the same allegations that were investigated and deemed unfounded by DCCYS.

Due to the DCCYS investigation, a sixty (60) day safety plan was entered providing Father no contact with the minor children. Upon expiration of the safety plan, this Court entered an Order, following a pretrial conference with counsel, which provided Mother with primary custody, and Father with supervised visitation at the YWCA.[2] This Order was entered to protect the children from any possible abuse, ensure the safety of the children, and protect Father from any further allegations pending resolution of the criminal charges. The February 15, 2017 Order did not alter the custody that had been previously entered aside from the location of the supervised visitation – Mother was provided primary custody, and Father supervised visitation at ABC House at least once per week – pending resolution of the criminal charges. Therefore, as there was no change of custody, and it is an interim order, it is not necessary for this Court to address the custody factors at 23 Pa.C.S.A. § 5328(a)(1), and there is no error.[3]

Appellant also alleges that this Court erred in failing to accept as true the opinion of an expert merely because the parties agreed to utilize her services. Apparently Appellant forgets that as the trier of fact, this Court is tasked with determining the credibility of witnesses, even expert witnesses. Just because two parties agree to utilize an expert, does not mean that the court must accept that opinion as true – it is within the

---

[2] See Order of June 13, 2016. The Court notes, however, that supervised visitation did not begin until October 1, 2016. This is more fully discussed in our Memorandum Opinion beginning on page 19 of 23.
[3] This Court notes that Mother was only provided sole legal custody on a temporary basis through the safety plan. Mother's sole legal custody ended upon expiration of the safety plan. At the conclusion of the September 6, 2016 hearing, Mother was granted sole legal and primary physical custody. However, that was not memorialized into a written order.

court's discretion to determine the credibility of that witness. Appellant fails to cite any case law to the contrary.

Although this issue was addressed in our Memorandum Opinion on pages six (6) to nine (9), we will provide additional explanation for our decision. After listening to the testimony and reviewing the evidence presented, this Court found the testimony of Dr. Pittman to be subjectively biased toward Mother. As previously explained, this Court found Dr. Pittman's testimony to be subjective for a number of reasons, such as the fact that she asked Mother to respond to certain allegations that Father or his family reported, and failed to ask Father to respond to any of the allegations Mother or her family reported. Particularly disturbing to this Court is the significance that Dr. Pittman placed on the allegations of hoarding and a show-and-tell incident at M.K.'s school – both of which were reported by Mother – without even bothering to ask Father to respond to those allegations.

Further, this Court's observations of Dr. Pittman's testimony were ratified by Dr. Narayan's testimony. In addition to the portion of Dr. Narayan's testimony cited wherein he challenged the methodology and conclusions of Dr. Pittman's report, he further testified as follows:

> Q:     Now, did you agree with her other diagnoses of Richard that she outlined in her report?
>
> A:     I did not. She is done [sic] testing and came up with – on the last page of her report, page 48, obsessive compulsive disorder, yes, I agree with that. Hoarding disorder, not yet coded. . . . I don't agree that he has a hoarding disorder based on all the information I have seen. That doesn't mean it's not possible. It just means . . . it hasn't been something that been put on the table for me to identify at this point.
> However, social phobia I disagree with. I have seen zero evidence of social phobia. Yes, he was bullied as a kid. Yes, he was anxious as a kid, perhaps based on what people called him. I have not seen any evidence of social phobia.

He has friends that he has good connections with that are in the report. So even if I knew no knowledge of that, he described that. But when he comes to see me, he is very personable with my office staff. When I'm in the background or not there, he doesn't need me to be there. He approaches them very well. . . .

The diagnosis of fetishism, exhibitionism, frotteurism seemed to come directly out of the possibility in one of the reports that he has an interest in those things. You can't use that to make a diagnosis. I don't see where that's coming from.

And the other thing I would say is that he does have a diagnosis of major depression. He was suicidal when I saw him – admitted him to the hospital in 2002, and that diagnosis is omitted from her description.

(Notes of Testimony, Custody Hearing 9/6/16 (hereinafter "N.T. 9/6/16") at 144-45).

Additionally, Dr. Narayan testified at length regarding his concern that Dr. Pittman did not have a full understanding of OCD, its symptoms and treatment. As a psychiatrist who specializes in OCD, this Court found his testimony to be compelling:

Q: On page 46, where she talks about her opinions on OCD –

A: Yes. My concern is that . . . Dr. Pittman really . . . doesn't understand all of the symptoms of OCD or understand them significantly as they relate to ████████. The particular sentence she writes is the disconnect between ████████ report of dreaded fear as well as ████████ continuation of the practice – kissing is what the reference is here – makes no sense as ████████ reports he would never do anything that would harm any kids. **That's a cornerstone of OCD treatment.** You are going to have that "what if?" What if I could do something to hurt my kids? That's part of the diagnosis. And so, again, he's going to probably imagine me telling him, no, you need to go ahead and do this. His wife insisting that he doesn't do it is only going to serve to – like, the person with the knives and the table. Put your hands up and not touch the knives. It's going to cause him to stay [a]way from the kids longer, and he'll be separated in terms of interacting with his kids. . . . **Of course, he's not going to do anything to hurt his kids, but he has that worry, that illogical worry that comes up.**

The review goes on to state that ██████ insists his estranged wife affirm and validate he did nothing wrong when he continued repeated kissing of his children also poses a problem for this evaluator. Not quite sure what is being referenced there in terms of OCD thinking, but my sense is that ██████ was probably getting blamed for going through with the kissing even though he was having this worry, which is precisely what the treatment is designed to do. You must continue to go about normal parenting behavior which includes kissing despite the anxiety being there.

Furthermore . . . the evaluator says, quote, "she has yet to learn of all the ways OCD could manifest and why, in particular, ██████ OCD centered on possible sexual impropriety." Well, that's basic. That's Psych 101. It's sexual. It's violence. It's religious. It's scrupulosity. Those are some of the basic ways the disorder presents.

Dr. Pittman makes reference to hoarding as an issue that often results from early childhood trauma. I'm not aware of any childhood trauma. It's never been described by ██████ I'm not sure where that's coming from, but it suggests, again, **she's searching for an underlying cause for the OCD.**

OCD is one of the most genetic psychiatric illnesses there is. There's very good data showing that parts of the brain that control OCD or repetitive thinking change in response to psychotherapy and in response to medication. It actually doesn't matter which one you choose. You can do just therapy; you can do just medication. Either one is fine. That changes the brain. That part of the brain becomes smaller, less overactive, more normal, if you will. And a lot of times there isn't an underlying problem in terms of events that happened. There can be, but it doesn't necessarily mean that's the case. **So those are my concerns . . . about her ability to, kind of, know this illness.**

There's another piece on page 47. I'm guessing it's the second paragraph based on the lack of indentation. "Yet ██████ had never had to reconcile why he fears contamination, whether of lead or semen, with the disconnect of, at times, unsanitary result of hoarding." Mouse droppings, black mold is what is goes on to say. **This is not a logical process. You can be deathly fearful of one thing and not**

**be fearful of another.** The person who's afraid of knives in my office may have no problem, you know, with some other type of obsessional though that the next person might worry about. So the fact that one has a worry in one area and a complete lack of worry in another area wouldn't surprise me at all.

(N.T. 9/6/16 at 145-48) (emphasis added).

It was obvious on cross-examination of Dr. Narayan that counsel for Appellant did not comprehend Dr. Narayan's testimony and explanation of OCD. When asked specific questions regarding Father's illness and the allegations made by Mother, Dr. Narayan was adamant that Mother's fear of Father harming the children is misplaced:

> Q: And you have testified, you said, of course, he's not going to do something to hurt his kids; correct?
>
> A: That's correct.
>
> Q: But you're not 100 percent certain of that, are you?
>
> A: Again, if I can clarify. No one can be 100 percent certain of anything, but with reasonable medical certainty, like I said earlier, I don't think he's going to do it.
>
> Q: But earlier in your testimony regarding OCD, you testified that there was a zero percent chance of ▓▓▓▓ turning that thought into an action; correct?
>
> A: Correct.
>
> Q: Okay. But now you're saying there's not a zero percent chance, that there is a possibility that ▓▓▓ could turn that thought into action; correct?
>
> A: Not an OCD thought, no.
>
> Q: So your testimony is still there's a zero percent chance of ▓▓▓▓▓ acting out these thoughts; correct?
>
> A: Correct.

(N.T. 9/6/16 at 164-65)

Q:     Okay. And is it fair to say that you had testified that you would agree that after repeated times of ████████ coming to ████████ and asking her if it was okay, that he fears or gets aroused when he lip kisses his daughter, that you would agree that ████████ would be ████ to have concerns about leaving her daughters with ████████ unsupervised?

****

A:     Yes, she should get concerned, **but concerned about where their relationship is going**. Am I just rescuing you from your own thoughts? That's where my concern would be. **It would not be regarding any danger for the child.**

Q:     So when you testified that you agreed that ████████ would have this thought and the thought was – you described it as this craziness when her husband is engaging in these lingering lip kisses with the daughter and then asking her it was okay, you now think that she's concerned for the safety of her marriage as opposed to the safety of her daughters?

A:     I think what you're describing is lingering kissing as if that's something he's doing. It takes two people to kiss. **My impression of the lingering kissing, based on his description to me, is that the child is hanging on and kissing longer – way longer than he feels comfortable.** So I'm not sure your question is something that I can answer directly.

(N.T. 9/6/16 at 168-69) (emphasis added). Much to Mother's chagrin, this Court made a credibility determination that Dr. Pittman was subjectively biased towards Mother, and therefore, little weight was afforded to her testimony. On the contrary, Dr. Narayan presented objectively, and he succinctly provided a detailed explanation of the OCD illness and how it relates to Father and the allegations made against him. Since credibility determinations are within the discretion of the fact-finder, i.e. this Court, there is no error.

Next, Appellant alleges that this Court erred by granting Father's relocation request without addressing the enumerated factors. This Court did not address the relocation factors as it relates to Father because the order entered is intended to be an interim order. On or about April 14, 2016, Father was given the choice of moving out of the marital home

or having the children placed into foster care due to Mother's allegations. Father chose to voluntarily move out of the marital residence to avoid putting the children through any more trauma. Further, due to the allegations by Mother and the resulting criminal charges, Father has been suspended from his position with the Pennsylvania Department of Environmental Protection ("DEP"). On top of losing his full-time position, Mother has also filed for child and spousal support, which Father has been paying. Due to Mother's actions, Father had no choice but to move in with paternal grandparents in Franklin County, Pennsylvania.

At this point, this Court does not know what the outcome of Father's criminal charges will be. Without the answer to that question, this Court is left with numerous variables on what could happen in the future – will Father remain in Chambersburg? Will he return to Halifax? Will he move somewhere in-between? Will he keep his position with the DEP? Will Mother find a job in Pennsylvania? Will Mother return to school in Pennsylvania? These are all questions that are left up in the air until the criminal charges against Father are resolved.[4] Accordingly, this Court granted Father's relocation out of necessity – he is suspended from his job, therefore is not getting paid, and had no other practical option other than to move in with his parents. Therefore, this Court did not err in granting Father's de facto relocation as he had nowhere else to go as a result of the allegations.

Appellant next alleges that this Court erred in granting Paternal Grandparents visitation rights. That is just incorrect. Our Order states "Paternal Grandparents are permitted to have reasonable unsupervised visitation with the minor children provided that

---

[4] The April 5, 2017 plea court was continued and reschedule until May 17, 2017. There is no indication on the docket at whose request the continuation was granted, or if there was even a request.

it occur in a public location."[5] Despite Appellant's characterization to the contrary, that provision does not afford Paternal Grandparents visitations rights. Rather, during the course of the proceedings, the Court made the observation that Mother isolated herself and the children from Father's family on or about April 14, 2016, and at the conclusion of the January 7, 2016 hearing, admonished Mother for cutting off communication with Father's family:

> The concern the Court has is the fact that although I can understand Mom's concern for what her husband with his psychological issues are and what she believes has occurred in the past, I don't understand how that translates into why grandparents, aunts, uncles, cousins, long-term friends have all been cut off. These are children that are in a terribly stressed situation. . . . I thought it was articulated by this Court that we would try to maintain as much normality for the benefit of these children as possible so they're not permanently scarred. Children can be resilient, even if something happened in the past, if you proceed with caution going forward. **But isolation is where this Court has a concern. But for that emergency action and that emergency hearing and this order – an order from this Court directing that the grandparents see the children for Christmas, I am confident that would not have happened, and that would have been grossly unfair not only for the grandparents; it would have been unforgivable for the children.** That's where the concern is.

(Notes of Testimony, Custody Hearing 1/6/17 (hereinafter "N.T. 1/6/17") at 176) (emphasis added).

Paternal Grandparents were intimately involved in raising M.K., as well as E.K., seeing the family at least twice a month until April 2016. After that date, Mother cut off all contact with Father's family, including Paternal Grandparents. When the supervised visitation began at ABC House, Paternal Grandparents expressed an interest in seeing

---

[5] *See* Order of February 15, 2017 at para. 8.

the children, and were willing to pay the fee to do so because it had been so long. Unfortunately, Mother did not agree, and admitted that she refused to allow Paternal Grandparents to have visitation. (Notes of Testimony, Emergency Hearing 12/9/16 (hereinafter "N.T. 12/9/16") at 54-55, N.T. 1/6/17 at 47). Mother states that she refused because there was no court order in place allowing them to have visitation. (N.T. 12/9/16 at 54). Further, since Father resides with Paternal Grandparents, her concern is that there is no guarantee Father will not be involved with the visit. (N.T. 1/6/17 at 47-48). Mother testified that she does not want Paternal Grandparents to have unsupervised visitation in order to ensure Father complies with his supervised visitation. (Id.)

After hearing the testimony and reviewing the evidence, this Court found no rational explanation for why Paternal Grandparents should not have unsupervised contact, and should be required to pay a fee in order to see the children at ABC House. Recognizing Mother's concern that Father could potentially have unsupervised contact with the children during Paternal Grandparent's visitation, this Court entered the provision above, permitting Paternal Grandparents to have visitation **in a public place**. We did not order Paternal Grandparents to have visitation on any particular day, or for any particular period of time. We merely made it known that Mother should afford Paternal Grandparents unsupervised contact of the children in a public place in lieu of supervised visitation at ABC House. After Father's criminal charges are resolved, this Court anticipates that there will be another hearing in this matter wherein we will have to determine a final custody order.

Lastly, Appellant alleges that this Court erred in requiring Mother to obtain the explicit consent of both parties before removing the children from Pennsylvania. She

alleges that this provision is an unconstitutional restriction on her right to travel. We disagree.

Throughout the course of the proceedings, it became obvious that Mother is anxious to move with the children to Utah. This Court believes Father's fear of being cut off from his children if Mother is permitted to relocate is a very real fear. As such, we included the provision in our Order so that Mother does not abscond with the children while Father's criminal charges, as well as this appeal, are pending. The provision does not restrict Mother's right to travel. It merely makes Mother go through the proper channels in order to do so with the children. If Mother wants to travel with the children, she must seek Father's express permission to do so. If Father refuses and Mother feels he did so in bad faith, she can petition the Court and request permission to travel and the Court would be favorably inclined to do so. Further, Mother is free to travel anywhere in the world without Father's permission as long as the children remain in Pennsylvania. Therefore, this Court did not err or abuse its discretion when requiring Mother to obtain the explicit consent of Father before removing the children from Pennsylvania.

As previously stated, Appellant's remaining allegations in her twelve (12) page Statement are merely complaints of dissatisfaction with this Court's ruling. In addition to counsel's characterization and opinion of the evidence, Appellant fails to cite to the specific testimony and/or evidence that would support her allegations. In fact, after reading the Statement, this Court is unsure whether Appellant was in the same courtroom that we were as the Statement includes a number of completely inaccurate statements of fact. It appears Appellant is using the "throw everything at the wall and see what sticks" method with this appeal. In custody proceedings, the trier of fact has the absolute

discretion to determine witness credibility and the weight to be afforded to the evidence. This Court did so, explained the reasons for doing so, and cited in the transcript where those reasons can be found – yet Appellant is still unhappy. However, Appellant's unhappiness does not mean this Court abused its discretion.

Accordingly, we ask the Superior Court to affirm our Memorandum Opinion and Order of February 15, 2017, and dismiss the appeal in this matter.

Date: _April 17, 2017_

**Respectfully submitted:**

William T. Tully, J.

DISTRIBUTION:
Robert M. Sakovich, Esquire, 2000 Linglestown Road, Suite 106, Harrisburg, PA 17110
Margaret M. Simok, Esquire, 3304 Market Street, Camp Hill, PA 17011
Court Administration
FILE